H. E. CHANDLER, Appellant,

v.

Thomas W. BUTLER, Appellee.

No. 6840.

Court of Civil Appeals of Texas.

Texarkana.

Nov. 10, 1955.

Rehearing Denied Dec. 8, 1955.

R. T. Wilkinson, Leonard Passmore, Mt. Vernon, for appellant.

Nelson & McCleskey, Harold O. Harriger, Lubbock, for appellee.

FANNING, Justice.

This is an appeal from an order sustaining a plea of privilege. Dr. H. E. Chandler, a resident of Franklin County, Texas, sued Thomas W. Butler, a resident of Lubbock County, Texas, alleging that

Butler or his agents and employees, acting within the scope of their employment, had by fraudulent representations made in Franklin County, Texas, induced Dr. Chandler to sell to Butler certain shares of stock; and sought recovery of damages both under Article 4004, R.C.S., and in the general sense. The plea to be sued in Lubbock County was seasonably filed and controverted on the ground that Butler (either in person or through his agents or employees acting within the scope of their employment) had committed a fraud on the plaintiff in Franklin County, Texas, within the meaning of exception No. 7, Article 1995, R.C.S., Vernon's Ann.Civ.St. art. 1995. On the hearing the plea of privilege was sustained. Appellant, Dr. H. E. Chandler, has appealed.

Appellant contends in essence that the trial court erred in sustaining defendant's plea of privilege because the pleading and evidence show that the defendant (either in person or through his agents or employees acting within the scope of their authority), in Franklin County, Texas, made a false and fraudulent representation relied on by plaintiff as to the value of the stock Butler purchased from plaintiff Chandler, which induced plaintiff to sell his stock for $9,850, when it had a market value of $14,442.50. Appellant in connection with the above contention also contends in essence that fraud may be shown by an affirmative statement or by artifice and concealment; that a representation need not be a direct lie in order to constitute remedial fraud and that a false representation may consist of a deceptive answer or any other indirect or misleading language. The essence of appellant's contentions is that under the pleadings and the undisputed evidence in the case plaintiff pleaded and proved a case of fraud on the part of appellee against appellant, committed in Franklin County, Texas, and which damaged appellant.

Appellee contends in essence that: (1) There was no showing that any fraud was committed; (2) that there was no showing that appellee was in Franklin County at the time of the alleged fraud; (3) that there was no showing that the parties involved in the transaction were the agents, employees or representatives of the appellee; and (4) that the fact issues were presumed to have been found in favor of appellee inasmuch as no findings of fact or conclusions of law were filed by the trial court.

Defendant's plea of privilege and plaintiff's controverting plea were introduced in evidence. The defendant, Thomas W. Butler, did not appear in person and did not testify at the hearing. Neither did Butler offer in evidence any testimony from either of the two parties (one of whom may have been Butler himself) who purchased for him the stock of Dr. Chandler. The only evidence offered in behalf of Butler was the testimony of his attorney, whose entire testimony was as follows:

"My name is G. H. Nelson. George W. McClesky, who signed the affidavit, is one of the attorneys, and was one of the attorneys at the time of the execution of the plea of privilege representing the Defendant Thomas W. Butler who resided in Lubbock County, Texas, at the time of the alleged offense and at this time."

The following witnesses testified on behalf of the plaintiff: Dr. H. E. Chandler, plaintiff, L. D. Lowry, Mrs. H. E. Chandler and J. H. Conley.

The plaintiff, Dr. H. E. Chandler, testified that he was 79 years of age, a medical doctor who had been practicing medicine since 1902, was a resident of Franklin County, and had resided there about 30 years, that the only business or calling that he had ever engaged in was the practice of medicine; that the only stock that he had ever owned was Franklin Life Insurance Company stock (except a little in another life insurance company which he still owned at the time of the trial); that on April 13, 1954, he owned common stock in Franklin Life Insurance Company and on that date he was contacted at his home in Mt. Vernon, Franklin County, Texas,

by two men, relative to selling his common stock in Franklin Life Insurance Company, that the men were strangers to him and he had not seen them before. He testified that the men introduced themselves to him and that "I think one of them was Thomas W. Butler." We quote further from Dr. Chandler's testimony as follows:

"Q. Do you have any recollection of what the name of the second individual was? A. No, I don't.

"Q. With which one of those men did you talk primarily? A. It was Butler.

"Q. Well, when they came to your door did they state the purpose of their calling on you? A. After they came in and sat down they did.

"Q. What was that purpose? A. They said they understood that I had stock in the Franklin Life Insurance Company.

"Q. Did they state how they learned that you owned such stock? A. No, they didn't.

"Q. What else did they say? A. They told me they wanted to buy some stock in that company, and they had made a deal with a millionaire to buy it for them, to buy stock for him.

"Q. Did they say they were buying it for the millionaire? A. That was the purpose.

* * * * * *

"Q. State whether or not they asked you if you would be interested in selling your stock in Franklin Life Insurance Company. A. Yes.

"Q. How many shares did you own in the company at that time? A. Two hundred eighteen shares.

"Q. When they asked you if you would be willing to sell your stock what reply did you give? A. I told them I might do so if I could get a good value.

"Q. Did you at that time know the market value of the stock? A. No, I didn't.

"Q. State whether or not you had any notion whatsoever as to the market value of that stock? A. No, I had no idea.

"Q. Well, state whether or not you inquired of the two men as to the market value of the stock? A. Well, when he asked me if I would sell I told him I might do so if I could get something like market value for it.

"Q. State whether or not you asked them if they knew the market value of the stock? A. I am not so sure that I asked them that, only to tell them that I would expect market value.

"Q. Did you ask them what the stock was worth? A. Well, when I told them about the market value they said We are paying $45 a share.

* * * * * *

"Q. What interpretation did you place on that reply at the time? A. Well, I expected what they meant by that was that was the market value.

* * * * * *

"Q. Did they make another offer for the stock that afternoon? A. I told them there after they figured up what that much would be there, I said how about $10,000 for it instead of Ninety-eight hundred and something, and he figured there awhile.

"Q. You say he figured, what do you mean by that? A. He took a paper and pencil and was figuring there, and then he said No, and told how much he would give but that was all I can do.

"Q. How much was it he offered for your stock then? A. It was up close to $10,000 and that is the reason I asked them if they couldn't make it $10,000.

"Q. Why did you ask him to make it $10,000? A. Because it was pretty close to that and we hadn't yet traded.

"Q. Now, after he did the figuring there in your office did he make a better offer on the stock than he had first made? A. He made some better offer, but not much, and he said that is all I can do.

"Q. Did the two men state where they lived? A. At Lubbock.

"Q. *I will ask you whether or not they made any mention of having bought Franklin Life stock from other persons? A. Yes, they did. In the argument persuading me to sell they said they had made several people happy and some of them had paid their mortgages off on their places.*

"Q. *Their statement that they were making people happy buying their stock, what significance did you attach to that? A. Well, I thought they were satisfying those people that sold that way.*

"Q. I will ask you whether or not either of them made mention of what they had paid those other people for their stock? A. They didn't say how much.

"Q. I will ask you whether or not you thought they were paying you what they had customarily been paying for your stock? A. Yes, naturally I would think that was a good square deal, if they had bought those people's property and they were happy over it.

"Q. I will ask you whether or not you accepted their offer to buy your stock? A. I finally did, yes.

"Q. And how much per share did they pay you for your stock? A. A little more than $45 I understand, I don't remember exactly to the dollar.

"Q. Was it less that $46 a share? A. I don't know about that, it all amounted to—I don't remember just exactly the dollar it did amount to.

"Q. Approximately what was the total amount they paid you for your 218 shares? A. Nine Thousand Eight Hundred Fifty Dollars.

"Q. That was the total consideration that they paid for your shares? A. The best I remember.

"Q. How was payment made, by check or cash? A. By check.

"Q. Did they have a check already made out, or was the check filled out in your office, or how? A. *He filled that check out in the office.*

"Q. *One of the two men did? A. Yes, I believe it was Butler, the man that signed the check, Thomas W. Butler.*

"Q. What did you do with the check when they filled it out? A. I told him we would have to investigate the check and he said he would pay the telephone bill, and we telephoned the bank.

"Q. Where was the bank located? A. Here in Mt. Vernon.

"Q. Why did you call the Mt. Vernon bank? A. I called the Mt. Vernon bank and asked him to—I believe that he talked to the banker.

"Q. Who talked to the banker? A. *Butler.*

"Q. That is the banker in the First National Bank? A. Yes, sir, I think he talked to him over the telephone.

"Q. Who is the banker you spoke of here in Mt. Vernon? A. Mr. Conley.

"Q. *Whose name was signed to the check? A. Thomas W. Butler.*

\* \* \* \* \* \*

"Q. *I will ask you whether or not that check given you in payment for your stock was honored by the drawee bank, was it paid? A. Yes, it was paid.*

\* \* \* \* \* \*

"Q. Doctor, I ask you whether or not you would have sold your stock on

April 13, 1954, to those men had you known they were paying less than the cash market value for your stock? A. No, I wouldn't have sold it.

"Q. I will ask you whether or not you thought you were getting the reasonable cash market value of your stock? A. I did.

"Q. Why did you think you were getting the reasonable cash market value of your stock? A. *Because I told them to start with that I wanted something like the market value and they told me that they were paying that amount, and another reason because they were behind time or for fear they would get behind time in buying stock for that millionaire.*

"Q. I will ask you whether or not you relied on their representation as to the value of your stock? A. Yes, sir, I did." (Italics ours).

Dr. Chandler further testified that he had never sold any stock prior to the transaction in question on April 13, 1954, that he did not know the cash market value of his stock and that he did not know how to follow the stock market in the newspapers and did not know how to find out learning the cash market value of stocks, had made no investigation of its market value and also testified:

"Q. I will ask you whether or not you relied on their representations as to the market value of your stock, or as to the value of your stock? A. Yes, I did. I didn't know any other means of knowing."

Dr. Chandler also testified that he sold the stock and delivered the stock certificates to Butler and that Butler's check to him, signed by Butler, for the stock, was paid. We quote from Dr. Chandler's testimony on cross-examination as follows:

"Q. You don't know now, except for that name that was on the check, whether Thomas W. Butler, the defendant, was present or not? A. That is the only way I know."

We also quote further from Dr. Chandler's testimony on re-direct as follows:

"Q. Why didn't you make an investigation as to the market value of your stock after the men called on you at noon? A. Well, I taken it for granted that we were getting the value, sufficient value to make a trade with them.

"Q. Why did you think you were getting full value on your stock? A. *Because of the way the conversation ran when they were talking about their being a little late to supply that millionaire with his stock, and then also I told them at the start that I wanted something like market value of it.*

"Q. Did the gentlemen express any interest in any other type of stock other than Franklin Life stock? A. No." (Italics ours).

L. D. Lowry, President of International Fidelity Insurance Company, after duly qualifying with respect to testifying as to the value of the stock in question, testified that on April 13, 1954, (the date of the transaction in question) the stock in question was quoted on the market at a bid of $66¼ and an ask of $67¼ per share and that the reasonable cash market value of the stock in question at said time was $66¼ per share. (The total value of the stock at that time was $14,442.50.) This testimony as to value stands undisputed in the record.

Mrs. H. E. Chandler, wife of plaintiff, testified that she also did not know anything about the value of the stock in question which was sold to the defendant and testified with respect to other matters.

J. H. Conley, Executive Vice-President of the First National Bank in Mt. Vernon, testified as follows:

"Q. I will ask you whether or not on April 13, 1954, or thereabout, Dr. H. E. Chandler presented a check to your bank for payment drawn on a Lubbock Bank on Mr. Thomas W. Butler? A. He did.

"Q. Did you see the check? A. I saw the check on April 14th.

"Q. Were you contacted by anybody prior to April 14 about the check? A. I did, on the afternoon of April 13th after the bank was closed Dr. Chandler asked me to call the bank in Lubbock and see if it was a good check.

"Q. What bank was it drawn on? A. The Citizens' National Bank in Lubbock.

"Q. What did you do? A. I called the bank in Lubbock.

"Q. Whose name was signed to the check? A. Thomas W. Butler.

"Q. What was the amount of the check? A. Nine Thousand Eight Hundred Fifty Dollars.

"Q. Did the signature on the check indicate that it was signed by any one other than Thomas Butler? A. No, it did not.

"Q. I will ask you whether or not that check was paid by the drawee bank in the regular course of business? A. It was." (Italics ours).

Appellee contends that fraud was not proved, evidently taking the position that there was no clear or direct representation by Butler or either of the two men who purchased Dr. Chandler's stock for Butler that the stock only had a market value of $45 per share, and that they were dealing at arm's length with Dr. Chandler, and owed him no duty in the matter.

We think the rule of law applicable to the situation as disclosed by the undisputed facts in this case is well stated in 56 A.L.R., p. 434, as follows:

"So, while recognizing that the prospective purchaser would not ordinarily owe the vendor the positive duty to inform the latter as to facts or conditions affecting the value of the land, in the absence of exceptional circumstances, *the courts have widely held that there are other circumstances not involving a fiduciary relationship, under which the vendor may have the right to rely upon the prospective purchaser telling the entire truth with respect to facts and conditions bearing upon such value; as where the vendor, being unacquainted with the land, specifically inquires what it is worth, or as to some particular matter which bears upon its value, or where to the purchaser's knowledge the vendor is in such a position that he cannot well find out the facts for himself, and so trusts the other to deal fairly with him. Under such circumstances it becomes the purchaser's duty to speak the truth, if he undertakes to speak at all, and a concealment or suppression of the truth, where coupled with any actual misrepresentation or over-reaching, however slight, may be sufficient to entitle the vendor to have the deed set aside, the circumstances amounting to fraud or deceit.*" (Italics ours).

We also think the following rules of law with respect to fraud announced in the case of Blanton v. Sherman Compress Co., Tex.Civ.App., 256 S.W.2d 884, 887, and numerous authorities cited therein, are applicable to the facts in this case, to-wit:

"1. A representation literally true is actionable if used to create an impression substantially false.

"2. Fraud is deducible from artifice and concealment as well as from affirmative conduct of a character to deceive.

"3. Although the plainest case of false representation is the telling of a deliberate and intentional lie, a representation need not be a direct lie in order to constitute remedial fraud, but the false representation may consist in a deceptive answer, or any other indirect but misleading language.

"4. Whenever issues of fraud and good faith are raised, the evidence must take a rather wide range and may embrace all the facts and circumstances which go to make up the trans-

action, disclose its true character, explain the acts of the parties, and throw light on their objects and intentions."

In Blanton v. Sherman Compress Co., supra, it is also stated:

"In Crompton v. Beedle, 83 Vt. 287, 75 A. 331, 334, 30 L.R.A.,N.S., 748, the court with approval quotes Lord Campbell in an English equity case: That not only a single word, but 'a nod or a wink or a shake of the head, or a smile from the purchaser, might defeat the application of the principle that mere reticence on the part of a purchaser does not in law amount to fraud.' "

We quote from 20 Tex.Jur., Sec. 20, Fraud and Deceit, pp. 38 and 39, as follows:

"When there is a duty to speak, fraud may consist in the concealment of a material fact.

" 'Misrepresentation may consist as well in the concealment of what is true as in the assertion of what is false. If a man conceals a fact that is material to the transaction, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact were expressly denied or the reverse of it expressly stated.' (Parker v. Crawford, 3 Willson Civ.Cas.Ct.App. § 365.)

"*Concealment in such case is the equivalent of an indirect representation that the fact does not exist; it differs from a direct false statement only in the mode in which it is made. Thus the suppression of information as to a material fact may be fraud when a vendor knows that the purchaser is acting on the supposition that no such material fact exists. In such case it is the duty of the vendor to communicate his knowledge of material facts, provided he knows that the other party is ignorant of them and has not equal opportunity of discovering the truth.*" (Italics ours).

In 20 Tex.Jur., pp. 59 and 60, it is also stated:

"When once it is established that there has been any fraudulent misrepresentation * * * by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by further inquiry. He has a right to retort upon his objector: 'You, at least, who have stated what is untrue * * * for the purpose of driving me into a contract, cannot accuse me of want of caution, because I relied implicitly upon your fairness and honesty.'

"The rule is applicable even though the falsity of the representation might have been discovered by an investigation or by the exercise of ordinary diligence. *Indeed, the doctrine has in Texas been carried to the length of protecting innocent victims who showed childlike faith in relying on the misrepresentations of those who, as has been said, led them like lambs to the slaughter.*" (Italics ours).

In King v. Cliett, Tex.Civ.App., 31 S.W. 2d 350, 353, wr. ref., it is stated:

"Our courts have uniformly held that, where a party, through fraud, obtains title to land, *all those who participated therein or received benefits therefrom are liable in damages to the party defrauded.* * * * Our courts universally hold that, where a contract, on its face, is so extortionate and unconscionable as to raise a presumption of fraud, it requires but a small amount of evidence to justify setting same aside. * * *

"Our courts further lay down the general rule that, where a contract is obtained for an inadequate consideration by reason of a misrepresentation of law or fact, or by reason of the weakness of the mind of one of the parties, or by gross imposition or un-

der circumstances of oppression which would justify a finding of undue influence, a court of equity will set the contract aside." (Italics ours).

In 20 Tex.Jur., Fraud and Deceit, Sec. 64, p. 99, it is stated:

· "Fraud of an authorized agent will invalidate a contract procured thereby, and may render the principal liable also in damages, although the principal had no knowledge of the fraud and did not consent to it. But this rule applies only when the agent was acting within the scope of his authority or when the principal has otherwise rendered himself liable. In such case, in determining the liability of the principal for the damages actually suffered, it is immaterial whether the principal, if he made such representations, or his agent, if he made them, was aware of the falsity, or made the representations innocently, believing them to be true. * * *"

In Russell v. Industrial Transp. Co., 113 Tex. 441, 251 S.W. 1034, 1037, 258 S.W. 462, 51 A.L.R. 1, affirming, Tex.Civ.App., 238 S.W. 1030, it is stated:

"While it is true that such agents sometimes depart from their instructions and exceed their authority in making representations, yet when they are acting within the apparent scope of their employment, when they do depart from their instructions and when they do falsify the facts, it is proper that their employer, who has put them before the world as his agent for the transaction of his business, should suffer from their dereliction, rather than the public who are preyed on."

We quote from 20 Tex.Jur., pp. 159 and 160 as follows:

"It (fraud) is not, in its nature, discernible by the direct evidence of the senses, and is usually so covert and concealed, or is attended with such attempts at concealment, as to be incapable of proof otherwise than by circumstantial or presumptive evidence. Its existence, in a given case, may be proved, either by intrinsic evidence of unfairness in the transaction itself, or by evidence of facts and circumstances attending it, which, by the ordinary tests by which we judge of the motives to action, appear inconsistent with an honest purpose. * * *

"Conversely a person charged with fraudulent dealing may prove the attending facts in order to show that the entire transaction was open and free from misrepresentation or other invalidating influence. * * *"

Appellee Butler did not take the witness stand to offer to prove or attempt to prove that the transaction in question was open and free from misrepresentation or other invalidating influence. Butler could have taken the stand and testified whether he made the statements to Dr. Chandler and whether he was personally present and signed his name to the check in question, and if he did not sign the check, he could have testified why he permitted it to be cashed at his Lubbock bank, whether the two men were his agents, and why he was still retaining the stock. Perhaps he could have testified as to the identity of the millionaire for whom the stock was purportedly being bought and perhaps he could explain or try to explain how the millionaire who was in a hurry to buy said stock was "making people happy" who had sold their stock to him. Perhaps he could have told whether those "happy" persons were being paid market value or ⅔ market value for their stock. Perhaps he could explain whether the evasive statement "We are paying $45.00 per share" (in reply to Dr. Chandler's insistence that he would sell if he could get market value) was true or not, whether they had paid market value to the "happy people" and whether any people that they had paid $45 per share had been made "happy" as represented by Butler and/or his agents. Perhaps Butler

could have also explained the necessity (and perhaps the real purpose) for the scene and act of figuring with pencil and paper in the presence of Dr. Chandler before he (or his agents) could arrive at a figure of $9,850 for stock that then had a reasonable cash market value of $14,442.-50. Also the man or men (if Butler was not personally present) who bought the stock and signed Butler's name to the check which was honored by Butler, would have been logical witnesses for Butler to have placed on the witness stand if they had been able to testify that the transaction was free from misrepresentation or other invalidating influence.

In 17 Tex.Jur., pp. 306–8, it is stated:

"Usually the force of evidence, though slight, is greatly increased by the failure of the opposite party to rebut it, where it is obvious that the means are readily accessible to him. The failure of a party to take advantage of an opportunity to explain inculpatory circumstances is evidence against him, and his failure to produce evidence in his possession which might have rebutted a presumption against him strengthens such presumption. Where a party does not in any way seek to contradict the testimony of his adversary on a particular point, the presumption is that he has no testimony to controvert it; and when the proof tends to establish a fact, and at the same time discloses that it is within the power and the interest of the opposite party to disprove it, the silence of the opposing party not only strengthens the probative force of the affirmative proof but of itself is clothed with a certain probative force. * * *

"Generally the failure of a party to an action to testify raises a strong presumption against him, and his failure or refusal when testifying to disclose a fact exclusively within his knowledge, or to explain the transaction involved, though afforded the opportunity to do so, and the fact that he

suppresses evidence or fails to disclose or state all of the facts within his knowledge, or that, when testifying, he fails to deny testimony of his adversary, raises a presumption or may be considered as a circumstance against him. * * *".

 If Butler or his agents had made an unquestionably clear, unequivocal and direct statement that the market value of the stock in question was $45 per share at the time in question, then there would be no question but that a case of simple and direct fraud had been proven. But under the authorities hereinbefore referred to it is not always necessary to prove a direct misrepresentation in order to constitute fraud, and the peculiar circumstances of each case must determine whether fraud has been committed.

The testimony of Dr. Chandler was clear, positive, direct, free from any circumstances tending to cast suspicion upon it, and was not in any way contradicted by appellee or any witness or by any of the attendant circumstances, nor was it in anywise discredited by appellee in any manner. (As hereinafter shown it was also corroborated in important respects.) In Watson v. Roche, Tex.Civ.App., 224 S.W.2d 297, the rule is stated that generally testimony of an interested party only creates an issue of fact, but where the opposite party is in a position to contradict or discredit such testimony and fails to do so, the interested party's testimony (where it is clear and positive) will be taken as true. And in Fowler v. Texas Employers Ins. Ass'n, Tex.Civ.App., 237 S.W.2d 373, error refused, it was also held that generally the testimony of a party to a suit does no more than raise a fact issue, though uncontradicted, but such a witness' clear, direct and positive testimony, not contradicted by any other witness or attendant circumstances, is taken as true as a matter of law.

The testimony of Dr. Chandler with respect to the pertinent circumstances surrounding Butler's check and the honoring

of it by Butler's Lubbock bank was further corroborated by the clear, direct, positive and undisputed testimony of Mr. Conley, Vice-President of the Mt. Vernon bank. The testimony of L. D. Lowry and Mrs. H. E. Chandler, hereinbefore related, was also clear, direct, positive and undisputed. in this record.

 Under the undisputed facts of this case Dr. Chandler did not know the market value of his stock at the time of the transaction in question, and we think it is a logical inference from the evidence adduced that this soon became readily apparent to appellee and/or his agents; it is also evident and logical inference from the evidence adduced that appellee and/or his agents who were buying Franklin Life stock for a millionaire and "making people happy" about it, and who sought out Dr. Chandler to buy his stock, were in a better position to know and had superior knowledge of the value of the stock than Dr. Chandler did; it is also evident from the evidence that Dr. Chandler was trusting appellee and/or his agents to deal fairly with him and that this was well known by appellee and/or his agents. Under the peculiar circumstances as shown by this record, appellee and/or his agents were not dealing solely at arm's length with Dr. Chandler, and it was their duty to speak the truth with respect to market value of the stock, and they had no right to evade, conceal, suppress, or misrepresent the truth in this matter, and they had no right to mislead and overreach Dr. Chandler in the transaction.

Considering all of the facts and circumstances in this record and the logical inferences and presumptions to be drawn therefrom, the unquestioned unfairness of the transaction and the undisputed overreaching of the 79-year-old plaintiff by Butler and/or his agents, by the various subtle, concealing, evasive and fraudulent methods shown in the record, it is our opinion that the undisputed facts in this case show that Butler (either in person or through his agents acting within the scope of their apparent authority) committed a fraud against Dr. Chandler in Franklin County, Texas, which damaged Dr. Chandler in the sum of $4,592.50. The evidence strongly indicates Butler was present at the transaction in question in view of Dr. Chandler's testimony and in view of the undisputed fact that Butler's name was signed to the check and it was cashed by Butler's bank and there is no testimony from Butler that he was not there and no testimony from him that he did not sign or authorize some one else to sign the check for him. At any rate the testimony is undisputed that one of the two men in question signed Butler's name to the check, that Butler's bank in Lubbock paid the check, and that Butler received the stock in question, and unquestionably received the fruits of the fraud, whether he committed it in person or by some one acting for him, and in the absence of any explanation from Butler, we think the circumstances undisputedly show that the person who signed the check and made the representations and statements outlined in the record, if it was not Butler in person, it at least shows that such person was an agent of Butler, acting within the scope of his apparent authority. And the record clearly shows that Butler has not offered to disgorge the fruits of the fraud which if not personally committed by him was committed by his agent for the direct pecuniary benefit of Butler.

 We hold that under the record in this case, and under the peculiar and unusual facts of this case, all of which are undisputed, that plaintiff-appellant pleaded and proved that appellee Butler (either in person or by his agents acting within the apparent scope of their authority) committed actionable fraud on the plaintiff in Franklin County, Texas, to plaintiff's damage, within the meaning of exception No. 7, Article 1995, R.C.S. In addition to the authorities hereinbefore cited, see the following authorities: Clark on "Venue in Civil Actions in Texas," Chap. 7, Secs. 3, 4 and 5; Article 4004, R.C.S.; Ten-Cate v. First Nat. Bank, Tex.Civ.App., 52 S.W.2d 323; Rutherford v. Wilkins, Tex.Civ.App.,

230 S.W. 1115, writ dis.; Tips v. Barneburg, Tex.Civ.App., 11 S.W.2d 187, writ ref.; Hester v. Shuster, Tex.Civ.App., 234 S.W. 713, writ dis.; Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808; Cockburn v. Dixon, 152 Tex. 572, 261 S.W.2d 689; Reese v. Phillips, Tex.Civ.App., 233 S.W.2d 588.

Appellee relies heavily upon the case of Compton v. Elliott, 126 Tex. 232, 88 S.W. 2d 91. Justice Culver of the Texas Supreme Court, in Cockburn v. Dixon, supra, 261 S.W.2d 689, 690, gives the following analysis of the holding in the Compton v. Elliott case, to-wit:

"In Compton v. Elliott it was held, that the plea of privilege was properly sustained where the trial court found upon sufficient evidence that the crime of malicious prosecution had not been committed. The court observed that on appeal from the judgment sustaining or overruling the plea of privilege the power of the Court of Civil Appeals in reviewing the fact findings made by the trial court is the same as it is in any other appealed case."

Also in Compton v. Elliott, supra, the Commission of Appeals in its opinion stated that the evidence was sharply conflicting and that the testimony in the record was sufficient to support either conclusion.

In Compton v. Elliott, supra, the evidence was sharply conflicting; in the case at bar the facts are undisputed and are all in favor of appellant Chandler.

We hold that the undisputed facts under the record in this cause compel the rendition of judgment overruling the plea of privilege. We hold that the trial court erred in sustaining defendant's plea of privilege.

The judgment of the trial court sustaining defendant's plea of privilege is reversed and judgment is here rendered overruling defendant's plea of privilege so that plaintiff's cause of action may be tried on its merits in the District Court of Franklin County, Texas.

Reversed and rendered.