COMMONWEALTH MORTGAGE CORP., Plaintiff–Counter Defendant–Appellant,

v.

FIRST NATIONWIDE BANK, Defendant–Counter Plaintiff–Third Party Plaintiff–Appellee.

No. 88–1212.

United States Court of Appeals, Fifth Circuit.

May 30, 1989.

Larry M. Lesh, David F. Blanke, Cynthia Keely Timms, Dallas, Tex., for Commonwealth Mortg. Corp.

Charles A. Gall, John C. Eichman, Theodore W. Daniel, Dallas, Tex., for defendant-counter plaintiff-third party plaintiff-appellee.

Patrick F. McManemin, Anissa D. White, Dallas, Tex., for third party defendant-appellant.

Before WILLIAMS, HIGGINBOTHAM and SMITH, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Commonwealth Mortgage Corporation sold a construction loan made to Bali Industries, Inc. to Saint Louis Federal Savings & Loan Association.[1] It turns out that there was a landfill beneath the surface of the land on which Bali was to build a condominium complex. A suit and trial followed. A jury returned a verdict in favor of Saint Louis Federal and against Commonwealth for breach of contract, fraud, and violations of the Texas Deceptive Trade Practices Act. The district court entered judgment requiring Commonwealth to repurchase the loan and awarding additional damages pursuant to the DTPA. Commonwealth appeals, challenging the submission of certain questions to the jury and the jury's failure to accept two of its defenses. Commonwealth also appeals the trial court's failure to deliver several requested jury instructions and its decision to award DTPA additional damages. We reverse the award of additional damages, but otherwise affirm the district court's judgment in all respects.

I

From late 1982 through early 1983, Saint Louis Federal purchased fifteen construction loans from Commonwealth. In each transaction, Commonwealth provided Saint Louis Federal with a loan package, containing information about the project to be financed. Officers of the two companies would visit the site of the proposed development. Saint Louis Federal did not meet with the borrowers, but analyzed each transaction based on the information provided by Commonwealth. When Saint Louis Federal agreed to purchase a loan, the parties would sign a Commitment Letter. Later, when the loan was actually sold, the parties would execute a Whole Loan Sale and Servicing Agreement. After closing, Commonwealth serviced the loans, periodically reporting to Saint Louis Federal the status of each project and requesting reimbursement for funds disbursed under the various loan agreements.

The Bali loan, the concern of this lawsuit, was made to Bali Industries, Inc. The loan was guaranteed by Faye Hiller, Bali's owner, and by another entity she owned, 4515 Corporation. The Bali loan was to finance construction of a 226–unit condominium complex on a 19–acre tract of land near White Rock Lake in Dallas. Saint Louis Federal signed a Commitment Letter on

---

1. After trial, First Nationwide Bank was substituted as a party for Saint Louis Federal. For simplicity, we will refer to Saint Louis Federal throughout the opinion.

December 2, 1982. The parties executed a sale and servicing agreement on December 6. A new Commitment Letter was executed on December 23, reflecting minor changes in the transaction. Saint Louis Federal began funding the loan on December 15.

The loan agreement provided for a total loan to Bali of $13,355,200, allocated to various purposes. Of the total, $1,335,520 was designated as "Contingency and Other Allocation," a special fund designed "to meet such other costs and expenses incurred in connection with the construction of the improvements as Lender shall approve." However, disbursement from this contingency fund was conditioned on the borrower obtaining an unconditional letter of credit or other collateral satisfactory to the lender to cover the requested amount.

The Commitment Letter executed by Saint Louis Federal and Commonwealth contained several representations which served as the basis for Saint Louis Federal's breach of warranty claims at trial. The Whole Loan Sale and Servicing Agreement included a repurchase provision:

> Seller, upon Buyer's request, agrees to repurchase any mortgage covered by this agreement within 18 months after date of Buyer's remittance if any misstatement of material fact, intentional or otherwise, is disclosed by actual inspection by Buyer or its representative, or otherwise, for an amount equal to its then unpaid principal based on the same percentage rate at which it originally was purchased, plus accrued interest and costs incurred by Buyer....

This repurchase provision formed the basis for Saint Louis Federal's breach of contract claim.

In addition to the information contained in the loan package provided by Commonwealth, the parties discussed the Bali loan on two occasions. In November 1982, Steve Williams, Commonwealth's Senior Vice President of Loan Production, met with two Saint Louis Federal representatives, Gil Wolf and Bob Rowlinson, and flew with them over the site. On December 2, the day before the first Commitment

Letter was signed, Williams and Ralph Senter, an Executive Vice President at Commonwealth, flew to Saint Louis for a second meeting with Saint Louis Federal concerning the Bali loan.

At trial, Saint Louis Federal complained that Commonwealth misled it about the condition of the property, the background of Ms. Hiller, and the use of the loan proceeds. Ms. Hiller received a report on the property in October of 1982 indicating a serious landfill problem with the site:

*Explosive Gases*

Most of this site is underlain by variable depths of trash and debris. This fill is apparently burning in one area of the site. Construction over such fills involves considerable risks and is not advised.

Settlements in the fills can affect not only structures, but also area paving. Such fills generate combustible gases. A summary of explosimeter readings made in the borings is included in the Appendix. All readings were positive except for number 11. These gases can accumulate under structures, clay layers, and even paving.

The recommendations provided below are presented for use if construction proceeds. Such systems have performed in a reasonably satisfactory manner on similar sites; however, the debris at these sites was not burning.

The report recommended steps to reduce problems should the developer proceed. Ms. Hiller testified that she read portions of the report to Steve Williams at Commonwealth as soon as she received it, and gave him a copy in November of 1982. Thus, the jury was free to conclude that Williams knew of the landfill problem before the first meeting with Saint Louis Federal.

Bob Rowlinson's testimony indicated that Saint Louis Federal knew there was some fill in the site of a "minor nature" before closing. Gil Wolf's loan submission sheet, prepared for Saint Louis Federal after the first meeting with Commonwealth, states that "the back part [of the property] has some filled ground but certainly buildable." Wolf testified in his deposition that it was

"the Commonwealth people" who said the project was "buildable," but he could not recall precisely who made the statement. Ralph Senter admitted that at the second meeting in Saint Louis, he and Williams told Saint Louis Federal that the "location was excellent" and that the project was "viable" in an economic sense, though he could not remember using the word "buildable." However, Senter admitted that "if a project wasn't buildable, it wouldn't be viable." Senter also indicated that he and Williams "went over [Saint Louis Federal's] site inspection with them" and agreed with it. Williams testified only that Commonwealth had told Saint Louis Federal the project was "feasible."

Rowlinson and Wolf became concerned about Hiller's background and experience as a developer, and asked Williams to provide some documentation of her abilities. Williams wrote a letter on December 12, 1982, stating, "I have known Faye for several years prior to our dealing with her on project construction." The letter then gave a positive assessment of Hiller's abilities as a developer. Williams also attached a copy of Ms. Hiller's resume to the letter. According to the resume, Hiller had studied Business and Finance for two years at the University of Hawaii and, from "1976 to present," had been the owner and general manager of 4515 Corporation. The resume contained a list entitled "Construction," which included several multi-unit apartment complexes in the Dallas area.

Williams admitted that he had met Hiller in the fall of 1981, only a few months before Commonwealth first loaned her money. Hiller testified that she had never attended the University of Hawaii and had included that item on her resume because Williams suggested "that if we showed some college . . . it would look a lot better." She also testified that 4515 Corporation was not actually incorporated until 1980. While Hiller had owned another corporation called Southwest Industries since 1976, that company had gone bankrupt in 1981. Of the "construction" projects listed on her resume, most involved rehabilitation of previously constructed apartment complexes. Hiller had never attempted a project of the

same magnitude as the one proposed to Saint Louis Federal. In fact, her only multifamily construction projects were still being constructed under different loans from Commonwealth. One of her Commonwealth loans was declared in default the month after Williams wrote to Saint Louis Federal. Hiller testified at trial that she had told Commonwealth about the apartments she rehabilitated and "explained to them the years" she had been in construction.

Saint Louis Federal's third area of complaint involved the use of $50,000 of the loan proceeds. Because of the landfill problem, Hiller obtained a $50,000 reduction in the price of the property. Williams and Hiller decided that the money saved should be placed in an escrow account for Hiller's use in paying the closing costs on other loans provided by Commonwealth. Williams testified that he obtained Saint Louis Federal's approval of this use of the money, but Saint Louis Federal denies that it knew of the reallocation.

Saint Louis Federal did not discover the seriousness of the landfill problem until Hiller called Rowlinson directly on March 22, 1983. As a result of the call, Rowlinson sent Robert Brunk to Dallas for investigation. Thereafter, Saint Louis Federal rejected a proposal to change the development by moving all of the housing units to the front portion of the property where there was no filled acreage. It agreed to allow use of the contingency reserve portion of the loan to replace the landfill with clean dirt, but only if Hiller provided a letter of credit as required by the loan agreement. Estimates for such an undertaking ranged from $895,000 to $2,100,000, the latter figure being substantially higher than the budgeted reserve account. Saint Louis Federal finally sent two letters to Commonwealth, on May 30, 1984 and October 1, 1984, demanding that Commonwealth repurchase the Bali loan pursuant to the repurchase provision of the Whole Loan Sale and Servicing Agreement.

Commonwealth commenced a declaratory judgment action in the Northern District of Texas on October 30, 1984, seeking a deter-

mination of its rights and liabilities. Saint Louis Federal counterclaimed for repurchase of the loan and damages. The jury found that Commonwealth had breached the contract, committed fraud, and violated three distinct provisions of the Texas Deceptive Trade Practices Act. While it rejected the defenses submitted by Commonwealth, it found for Commonwealth on Saint Louis Federal's claim for breach of fiduciary duty. The jury assessed compensatory damages at $2,356,029, DTPA additional damages at $1,215,283.55, and exemplary damages at $1,016,987. The district court entered judgment requiring Commonwealth to repurchase the loan for $6,047,-438.79, pay the DTPA additional damages assessed by the jury, and pay Saint Louis Federal's attorney's fees.

## II

■ Saint Louis Federal's breach of contract claim turned on the question of whether Commonwealth made "any misstatement of material fact," triggering the repurchase provision of the contract. The judge instructed the jury:

St. Louis Federal contends that the following statements by Commonwealth were misstatements of material fact: first, that the property in question was "buildable;" second, that the property was "viable;" and third, that the property was "an excellent location."

Previously, the district court had instructed that Saint Louis Federal had to prove the statements attributed to Commonwealth "were made by an agent of Commonwealth who possessed authority to make such representations." The breach of contract special verdict interrogatory asked whether Commonwealth made a misstatement of material fact, intentional or otherwise, prior to Saint Louis Federal's purchase of the Bali loan. The jury answered "Yes."

The fraud instructions followed a similar format. After instructing on the elements of fraud, the charge listed a series of representations alleged by Saint Louis Federal

to be fraudulent. These included the three statements listed for the breach of contract count, as well as certain representations or omissions concerning Hiller's background and the use of the loan proceeds. The interrogatory then asked whether Commonwealth committed fraud which caused Saint Louis Federal to purchase the Bali loan, and whether the fraud proximately caused Saint Louis Federal to suffer actual damages. Again, the jury answered "Yes."

Commonwealth levels various attacks on the submission of the phrases "buildable," "viable," and "excellent location" to the jury on the fraud and breach of contract counts. Initially, Commonwealth challenges the evidence showing that it represented the property to be buildable. The evidence on this point consisted of testimony of Gilbert Wolf when asked about the conclusion on Saint Louis Federal's loan submission sheet that though the property included some filled ground, it was buildable. Wolf attributed the phrase to "the Commonwealth people," but could not recall who at Commonwealth described the property as buildable.

Under Texas law, a principal can be held liable for misrepresentations of an agent speaking within the scope of his authority.[2] Commonwealth relies on *General Electric Credit Corp. v. Grubbs*,[3] in which we considered a claim based on "slanderous accusations." Various customers of Grubbs testified that men who "represented themselves to be" or "purported to be" employees of GECC had made accusations concerning Grubbs' business practices. We held that Grubbs could not recover against GECC for the slanderous accusations made by the nameless accusers. Noting that Grubbs had the burden of proving the men were GECC employees acting in the scope of their employment, we found no evidence in the record supporting either element.

This case differs from *Grubbs*. Wolf identified the speaker as one of the "Com-

---

2. *Pasadena Associates v. Connor*, 460 S.W.2d 473, 479 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd, n.r.e.).

3. 478 F.2d 53, 57–58 (5th Cir.), *cert. denied*, 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 104 (1973).

monwealth people." Thus, the jury possessed evidence that whoever made the representation worked for Commonwealth. The jury could also conclude from this record that the speaker had authority to bind Commonwealth. Wolf at the time was the Saint Louis Federal Vice President in charge of the loan department. His dealings with Commonwealth were apparently confined to negotiations over the sale of loans like the Bali loan. Because of the geographical distance between the two companies, Wolf did not have regular contact with Commonwealth employees. Indeed, Commonwealth points to no evidence that there was anyone likely to speak with Wolf who the jury could not find had authority to bind the company. Unlike *Grubbs,* then, we find sufficient evidence to create a jury question on both elements required to bind Commonwealth to the representation that the property was "buildable."

Commonwealth argues that the evidence was insufficient to find its representations false. We disagree. The jury had evidence that the condominium project could not be built on the property in its condition at the time of the statement. While the landfill could have been removed and replaced with new dirt, estimates of the cost of such an undertaking ran well beyond the contingency reserve included in the loan agreement.

Commonwealth specifically attacks the sufficiency of the evidence that its representation concerning the excellence of the location was false. When understood to mean only geographical location, Commonwealth asserts that the location of this property was excellent. The site was close to downtown, with easy access to the city, and was large enough to accommodate the size of development being planned. Commonwealth claims that the phrase need not be construed to imply anything about the ability to construct a condominium complex on the property.

We reject the argument. Under Texas law, "[a] representation literally true is actionable if used to create an impression substantially false." [4] In the context of these negotiations, the jury could find the representation to include the ability to construct the condominiums. A location can only be "excellent" with reference to the purpose envisioned. The representation in this case was that the property was excellent for the planned condominium development. Regardless of the literal truth of one construction of the phrase, the jury could conclude on these facts that Commonwealth's description of the property was designed to mislead.

Finally, we do not agree that Commonwealth's representations constituted mere opinion. In *Presidio Enterprises, Inc. v. Warner Brothers Distributing Corp.,* [5] we said that a statement is one of fact rather than opinion when it can be adjudged true or false by empirical evidence. The representation that a given piece of property is adequate to build a certain condominium complex for a fixed amount of money admits of empirical verification. Further, this was not merely a prediction about what could occur in the future, but an assertion about the present condition of the land.

### III

■ Commonwealth argues that two defenses rejected by the jury compelled judgment in its favor on the contract and fraud counts as a matter of law. First, Commonwealth contends that Saint Louis Federal ratified the contract by accepting contractual benefits after it became aware of Commonwealth's fraud. The argument rests on the assertion that Saint Louis Federal accepted interest payments on the loan until July 1983, even though it learned of the problems with the site in March 1983. "The key element which must be proved to establish ratification of the fraudulent con-

---

**4.** *State National Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 681 (Tex.App.—El Paso 1984, writ dism'd by agreement of parties); *Chandler v. Butler,* 284 S.W.2d 388, 394 (Tex.Civ.App.—Texarkana 1955, no writ); *Blanton v. Sherman*

*Compress Co.,* 256 S.W.2d 884, 887 (Tex.Civ.App. —Dallas 1953, no writ).

**5.** 784 F.2d 674, 679 (5th Cir.1986).

duct is that the ratifying party had full knowledge of the fraudulent acts at the time he ratified these acts."[6] In order to establish its ratification defense, then, Commonwealth had to show that Saint Louis Federal was aware by July 1983 that Commonwealth knew of the actual soil condition when the loan transaction was closed in December 1982. The only evidence Commonwealth points to is a memorandum prepared by Robert Brunk for Saint Louis Federal after his trip to Dallas to meet with Ms. Hiller in March 1983. According to that report, "[Ms. Hiller] says Commonwealth knew of the site problem in January of 1983," a date after the December closing. The report also refers to a letter Ms. Hiller wrote to her attorney concerning her problems with Commonwealth, but that letter was apparently never admitted into evidence. Further, it seems unlikely that Brunk would have used the January 1983 date in his report if the letter indicated that Commonwealth knew of the landfill problem at an earlier time. Thus, the record does not conclusively show that at the time it allegedly ratified the contract, Saint Louis Federal was aware that Commonwealth knew of the landfill problem prior to closing. The jury could properly reject Commonwealth's ratification defense.

■ Commonwealth also argues that Saint Louis Federal waived the right to invoke the repurchase provision of the contract because it failed to list Commonwealth's misstatements of fact as a basis for seeking repurchase of the loan when it submitted its demand letters. Such a requirement does not appear in the contract itself. To trigger the repurchase provision, Saint Louis Federal must request repurchase of the loan within eighteen months, and a misstatement of material fact must be "disclosed" (to Saint Louis Federal, not to Commonwealth). The contract does not say that Saint Louis Federal must tell Commonwealth what those misstatements of fact were within the eighteen month period. Thus, the contract does not prevent Saint Louis Federal from relying on Commonwealth's misstatements in seeking enforcement of the repurchase provision at trial. Nor has Saint Louis Federal waived its right to invoke the repurchase provision as a matter of general contract law. "[A]bsent bad faith or a change of position a party is 'not prevented from relying upon one good defense among others urged simply because he has not always put it forward.'"[7] A different rule might apply had Commonwealth been prejudiced by Saint Louis Federal's failure to include misstatements of fact in its demand letters as a basis for the repurchase. For instance, in *Schriewer v. Liedtke,*[8] a contracting party asserted various untenable reasons for cancelling the contract. The Texas court refused to allow later assertion of more substantial reasons for not performing, because the delay had deprived the other party of an opportunity to cure the newly asserted infirmities. In this case, however, Commonwealth does not allege that it was prejudiced by Saint Louis Federal's failure to include the misstatements in its demand letters. This case differs from *Schriewer* because Commonwealth was not precluded from curing some defect in its performance by Saint Louis Federal's tardiness.

IV

■ Commonwealth contends that the district court erred in failing to submit various tendered jury instructions. First, it argues that the district court should have instructed the jury that statements of fact received by a speaker and then passed on to another cannot be actionable misrepresentations. Under Texas law, an action for misrepresentation cannot be based on statements expressly represented to be made on information.[9] In this case, Steve

6. *Sawyer v. Pierce,* 580 S.W.2d 117, 122 (Tex.Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.).

7. *Accent Builders Co. v. Southwest Concrete Systems, Inc.,* 679 S.W.2d 106, 110 (Tex.App.—Dallas 1984, writ ref'd, n.r.e.) (quoting *New England Structures, Inc. v. Loranger,* 354 Mass. 62, 234 N.E.2d 888, 892 (1968)).

8. 561 S.W.2d 584, 587–88 (Tex.Civ.App.—Beaumont 1978, writ dismissed).

9. *J.L. Williams & Co. v. Robert E. McKee, Inc.,* 612 S.W.2d 649, 651 (Tex.Civ.App.—Dallas 1981, writ ref'd, n.r.e.); *Ratcliff v. Trenholm,* 596 S.W. 2d 645, 651 (Tex.Civ.App.—Tyler 1980, writ

Williams wrote a letter to Saint Louis Federal lavishly praising Faye Hiller. He attached a copy of Ms. Hiller's resume. In his letter, Williams stated:

> We are enclosing an extra copy of [Hiller's] resume, which shows the years of experience behind the knowledge and expertise she has in the business.
>
> Some of this information does not directly concern developing and construction, but it does give some insight into the person with whom we are dealing. In closing, it is evident that I personally recommend Faye as a borrower very highly as she has been successful in the past, and certainly has the ability to do so with the Highland View Condominium project.

Obviously, Williams did not "expressly represent" that he was only passing on information. His letter implies personal knowledge of, or at least support for, the representations contained in the resume. As the Texas Supreme Court said in *Boles v. Aldridge:*

> [W]here one man makes to another a certain definite and material statement ... plainly for the purpose of influencing the other's action, and expressly vouches for its truth, the circumstance that he revealed his want of actual knowledge renders it none the less his own affirmative representation.... It is of no consequence that it is made without actual knowledge but upon information, and such disclosure is made at the time.... The inquiry in all such cases is not whether the party making the representation has actual knowledge, but whether the statement is made as one of fact and purports to be the truth.[10]

Williams' letter shows that, though the information came from Hiller's resume, Williams was backing that information and asserting its truthfulness for the purpose of inducing Saint Louis Federal to act. This distinguishes the case from *J.L. Williams & Co. v. Robert E. McKee, Inc.,*[11] where the defendant showed the plaintiff a letter from a third party containing the alleged misrepresentations. Thus, in this case, we believe the district court properly refused to instruct on the actionability of information passed on from others.

■ Commonwealth next argues that the jury should have been instructed that a new and independent cause of an injury can break the chain of causation. It notes that, at least by some estimates, the loan contained a contingency allocation fund large enough to finance removal of the landfill. Thus, Commonwealth argues that the jury could have found Hiller's failure to obtain a letter of credit, which would have triggered release of the money, to be a new and independent cause of the failure of the construction project. If Hiller had obtained a letter of credit, the contingency allocation fund would have been released and might have sufficed to cure the defects in the property, allowing the building project to go forward.

Nevertheless, Hiller's failure was not an independent cause of the injury to Saint Louis Federal. Texas courts hold that a new and independent cause, a "separate or independent act that destroys the causal connection between the defendant's negligence and the plaintiff's injury," cannot be found "where the act alleged to be a new and independent cause is dependent on the defendant's negligent act."[12] Similarly, a new and independent cause will not "relieve a wrongdoer from the consequences of his negligence if that negligence directly and proximately 'cooperates' with the independent cause in the resulting injury."[13] For instance, in one case, a negligently unsecured billboard was blown

---

ref'd, n.r.e.); *Wright v. Carpenter,* 579 S.W.2d 575, 579 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd, n.r.e.); *Miller v. Esunas,* 401 S.W.2d 150, 156 (Tex.Civ.App.—Tyler 1966, writ ref'd, n.r.e.); *see also Boles v. Aldridge,* 107 Tex. 209, 175 S.W. 1052, 1053 (1915).

**10.** 175 S.W. at 1052.

**11.** 612 S.W.2d at 651–52.

**12.** *Allied Bank West Loop v. C.B.D. & Assoc.,* 728 S.W.2d 49, 55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd, n.r.e.).

**13.** *Gannett Outdoor Co. v. Kubeczka,* 710 S.W.2d 79, 85 (Tex.App.—Houston [14th Dist.] 1986, no writ).

onto a house by a hurricane. The court refused to treat the force of the winds as a new and independent cause of the damages, because the defendant's "negligence was the primary conduct which acted concurrently with the high winds to cause the sign's failure." [14]

Hiller's failure to obtain a letter of credit, by itself, cannot be considered a cause of the harm to Saint Louis Federal. Without Commonwealth's misrepresentations, Saint Louis Federal would never have participated in the loan transaction. But for Commonwealth's fraud, then, Saint Louis Federal would not have been harmed by the failure of the condominium development project. Thus, to the extent Hiller's failure to obtain a letter of credit could be considered a cause of harm to Saint Louis Federal, causation depended on Commonwealth's fraud. At the very least, Hiller's failure "cooperated" with Commonwealth's misrepresentations to cause Saint Louis Federal's injury.

■ Commonwealth further asserts that the district court erred in failing to submit a requested jury instruction defining the term "material" for purposes of the breach of contract claim. Commonwealth was not prejudiced by any error. The jury was correctly instructed on the meaning of the term "material" in the portion of the charge dealing with fraud. Considering the charge as a whole, then, no serious argument can be maintained that the jury was misled regarding the meaning of the word as used in the contract.

### V

■ Finally, Commonwealth asserts that the district court erred by awarding DTPA additional damages as well as requiring Commonwealth to repurchase the loan. The district court submitted liability inter-

rogatories for breach of contract, fraud, breach of fiduciary duty, and three separate DTPA counts. The jury found that Saint Louis Federal had met its burden of proof as to all of these theories except for breach of fiduciary duty. The court submitted one interrogatory on actual damages caused by Commonwealth's "wrongful acts." The jury found actual damages in excess of $2.35 million. It also made findings as to exemplary damages and DTPA additional damages. In its judgment, the district court required Commonwealth to repurchase the Bali loan from Saint Louis Federal, and also awarded the amount of DTPA additional damages found by the jury, as well as a reasonable attorney's fee.

DTPA additional damages are a form of punitive damages, awarded to punish the wrongdoer and set an example for others.[15] Under Texas law, exemplary damages may not be awarded for a breach of contract.[16] To recover punitive damages, a party "must obtain at least one finding of an independent tort with accompanying actual damages." [17] We take this to mean that the jury must attribute some actual damages to the tort which are not simultaneously attributed to the breach of contract.

One Texas court recently applied this rule to reverse an award of exemplary damages in an analogous case. In *Lovelace v. Sabine Consolidated, Inc.*,[18] the jury found that the defendant had breached two contracts, breached his fiduciary duty, and committed fraud. The jury then awarded actual damages attributable to the defendant's "conduct," without separation of damages according to the theory of liability. Finally, the jury awarded punitive damages. The Texas Court of Appeals reversed the award of punitive damages, reasoning in part:

---

14. *Id.* at 86.

15. *See Pace v. State of Texas,* 650 S.W.2d 64, 65 (Tex.1983).

16. *Amoco Production Co. v. Alexander,* 622 S.W. 2d 563, 571 (Tex.1981).

17. *Texas Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986); *see also Jim Walter Homes, Inc.*

*v. Reed,* 711 S.W.2d 617, 618 (Tex.1986) ("plaintiff must prove a distinct tortious injury with actual damages").

18. *Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 654–55 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

[S]ince we cannot determine from these special issues the dollar amount, if any, that was awarded for the torts of fraud and breach of fiduciary duty, we cannot determine whether the punitive damages are reasonable in relation to the actual damages in tort. It is the established law of Texas that the amount of exemplary damages should be reasonably proportioned to the actual damages found.

As for the contention of Sabine that Lovelace waived complaint by failing to object at trial to the submission of the form of the damage issues, Sabine mistakes where the duty to submit separate jury findings on damages lies. An appellant cannot be held accountable for the failure of an appellee to secure separate jury findings upon which an accurate judgment could be based. Nor can an appellate court imply a finding of actual damages in tort, because a court of appeals cannot make original findings of fact; it can only "unfind" facts. For the foregoing reasons, we hold that the trial court erred in awarding punitive damages where there was no independent finding of actual damages in tort.[19]

The award of additional damages in this case suffers from the same defect as the exemplary damage award in *Lovelace.* It is impossible to tell whether the jury found any independent tort damages which could serve as a basis for an additional damage award. The compensatory damage interrogatory did not ask the jury to apportion its damages according to specific theories of liability. The district court gave the following instruction on DTPA additional damages:

> The term "additional damages" means damages awarded in addition to any amount which you may have found as actual damages for a knowing violation of the Deceptive Trade Practices Act. Under Texas law, you may, in your discretion, award as additional damages an amount up to three times the amount of actual damages, if any, you have found in Question No. 13, to the extent such actual damages exceed $1,000. Accord-

ingly, if you decide to award additional damages, subtract the sum of $1,000 from the total of actual damages you have found in answer to Question No. 13. Your answer to Question No. 14 cannot exceed three times that net figure.

While informing the jury that the additional damages must be based on an award of actual damages for a DTPA violation, the instruction does not require the DTPA damages to be independent of any contract damages. Further, it implies that the additional damages need only be proportional to the entire award of actual damages in Question No. 13, and not specifically to the DTPA award. Since we cannot determine whether the jury made the findings necessary to support the award of additional damages, we reverse that portion of the district court's judgment.

AFFIRMED in part, REVERSED in part.

---

19. *Id.* at 655 (citations omitted).